IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| THOMAS ALVARADO,<br><br>Plaintiff,<br><br>vs.<br><br>WARDEN CROSSROAD CORRECTIONAL CENTER, et al.,<br><br>Defendants. | CV 15-00005-GF-BMM-JTJ<br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Plaintiff Thomas Alvarado, an inmate proceeding in forma pauperis and without counsel, filed a Complaint (Doc. 2) pursuant to 42 U.S.C. § 1983 alleging Defendants denied him medical care. (Doc. 2.) The Court screened the Amended Complaint pursuant to 28 U.S.C. § 1915 and determined that Defendants Sharpe, Yaskew, Finn/Linn, Weaver, Randolph, and Correctional Corporation of America were required to respond to Mr. Alvarado's allegations that he was denied over-the-counter pain relievers and/or other treatment for his broken finger and injured knee from November 5, 2013 to November 11, 2013. (Doc. 10 at 8.) Defendants filed a motion for summary judgment arguing that Mr. Alvarado failed to exhaust his administrative remedies with regard to this issue. (Doc. 41.)

Having considered the parties' arguments and submissions, the Court finds

1

that Defendants have not met their burden of demonstrating that administrative remedies were available and that Mr. Alvarado failed to properly utilize those remedies. The Motion for Summary Judgment (Doc. 41) should be denied.

## I. STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The party moving for summary judgment has the initial burden of showing there is no genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the moving party makes a prima facie showing that summary judgment is appropriate, the burden shifts to the opposing party to show the existence of a genuine issue of material fact. *Id*. On summary judgment, all inferences should be drawn in the light most favorable to the party opposing summary judgment. *Id*. at 159.

A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

By notice provided on August 8, 2016 (Doc. 44), Mr. Alvarado was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the

Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. FACTS

### A. Underlying Facts

Mr. Alvarado was convicted in federal court and sentenced on October 21, 2013 to the custody of the Bureau of Prisons. *See United States v. Alvarado*, 13-CR-00026-BLG-SPW, Doc. 127. Mr. Alvarado was held at Crossroads Correctional Center ("CCC") in Shelby, Montana, at various times, first, from 4/12/13 to 5/9/13, again from 5/30/13 to 10/2/13, and last from 10/23/13 to 11/12/13. (Statement of Undisputed Facts, Doc. 43 ("SUF") at ¶ 1.) At all times while Mr. Alvarado was housed at CCC, he was an inmate in the custody of the United States Marshals Service. (SUF at ¶ 2.)

Mr. Alvarado fell in his cell and injured his knee and little finger on Sunday, November 3, 2013. The SMU Lieutenant Finn/Linn saw Mr. Alvarado's injuries and directed staff to notify medical services. The duty nurse, Linda Rogers, observed Mr. Alvarado's injuries through the window in his cell gave him a few Tylenol tablets for pain and advised a correctional officer to have Mr. Alvarado ice his knee. The officer brought Mr. Alvarado ice every two to three hours for the rest of his shift. (Amd. Cmplt., Doc. 9-2 at 2.)

3

On Monday, November 4, 2013, Nurse Rogers told Mr. Alvarado he was scheduled to see the doctor on Wednesday, November 6, 2013. Mr. Alvarado explained that his knee and finger were extremely painful and needed to be x-rayed. Nurse Rogers responded that any treatment, x-rays, and pain medication including aspirin and Tylenol would have to be prescribed by the doctor. (Amd. Cmplt., Doc. 9-2 at 2-3.)

On the same day, Warden Sharpe came to Mr. Alvarado's cell and looked at his hand and knee through the cell window. Mr. Alvarado contends his knee was black and blue and swollen and he told the Warden it was very painful and he could not walk on it or put pressure on it. (Amd. Cmplt., Doc. 9-2 at 3.) Mr. Alvarado requested treatment, x-rays, and pain medications for his finger and knee and to be moved to a cell on a lower level so he did not have to climb the stairs. The Warden told him he would not order medical services to treat him, it was up to medical services what treatment he would receive including whether he received pain medication or crutches, and it was up to Mr. Alvarado to obtain the approval of the Marshal's Service to be taken to an outside hospital for treatment. (Amd. Cmplt., Doc. 9-2 at 3-4.)

Shortly after the Warden's visit, Case Manager Yaskew came to Mr. Alvarado's cell. He asked her to call the Marshal's Office and explain his injuries

4

and that he needed their approval before he could be taken to an outside hospital for treatment. Ms. Yaskew said she would make the calls and get back to him but she never did. (Amd. Cmplt., Doc. 9-2 at 4-5.)

Lt. Finn/Linn checked on Mr. Alvarado when he came on duty that evening and Mr. Alvarado asked to have x-rays taken of his knee and some medication for pain. Lt. Finn/Linn informed him that he did not have enough staff to escort him to an outside hospital and he would have to get approval from the U.S. Marshals before he could be taken to the hospital. Lt. Finn/Linn refused to call the U.S. Marshals Office to ask for approval. (Amd. Cmplt., Doc. 9-2 at 5.)

Mr. Alvarado saw Dr. Weaver on Wednesday, November 6, 2013. Dr. Weaver looked at Mr. Alvarado's finger and acknowledged that it was broken but said it was too swollen to do anything for it. He then grabbed Mr. Alvarado's left knee and tried to straighten it out. Mr. Alvarado screamed in pain and tried to get away. Dr. Weaver said there was nothing he could do and that he would need approval from the U.S. Marshals and the Warden before he could send him to an outside hospital for treatment. When Mr. Alvarado asked for pain medication and crutches, Dr. Weaver said that Mr. Alvarado did not need it. (Amd. Cmplt., Doc. 9-2 at 6.)

On Thursday, November 7, 2013, a weekly SMU case review was held and

5

Donna Randolph, Director of Medical Services chaired the team review. Mr. Alvarado asked to be moved to a cell on a lower level, for medical treatment, and for pain medication. Ms. Randolph had a nurse brought in to tape his finger. (Amd. Cmplt., Doc. 9-2 at 6-7.) Ms. Randolph informed Mr. Alvarado that only the doctor could authorize treatment but she would look at his request and get back with him. She never did. (Amd. Cmplt., Doc. 9-2 at 7.)

On or about November 11, 2013, Mr. Alvarado was transferred out of Crossroads and spent 11 days in transit to FCI Herlong in California (Doc. 9-2 at 7.) He alleges he is now permanently disfigured because his little finger extends at almost a right angle to his hand and he has a permanent limp. (Complaint, Doc. 2 at 7, ¶ 27.)

### B. Facts related to Grievance Procedures

A mandatory grievance procedure was in place at all times while Mr. Alvarado was housed at CCC. The procedure differs somewhat depending on whether an inmate is in state or federal custody. (SUF at ¶ 4.) Federal inmates are required to comply with CCA Policy 14-5. (SUF at ¶ 4.) This policy, which was in effect at CCC in November 2013, identifies what matters are grievable and which matters are non-grievable. (SUF at ¶ 6.) According to the policy, denial of medical care is a grievable issue. (SUF at ¶ 6.)

The policy establishes what is generally a three-step grievance process. To initiate the grievance process, an inmate must file an "informal resolution" within seven calendar days of the alleged incident. The prison official responding to the informal resolution then has fifteen days to respond, or to extend the response deadline in writing. (SUF at ¶ 7.)

At CCC, United States Marshals Service ("USMS") inmates such as Mr. Alvarado, "may bypass or terminate the informal resolution process at any point and proceed directly to the formal grievance process." As a result, USMS inmates may employ a two-step grievance process if they choose to do so. USMS inmates at CCC may also bypass the informal resolution requirement under limited circumstances by identifying their grievance as an "emergency grievance," in which case if the grievance officer determines that an emergency situation does exist, will require a response within one day. (SUF at ¶ 8.)

The second step of the grievance process, or the first step if the inmate chooses to skip the optional informal resolution, requires the inmate to file a formal grievance. The prison official responding to the formal grievance generally has fifteen days to provide a response to the formal grievance to the inmate. (SUF at ¶ 9.)

As the final step of the grievance process, an inmate unsatisfied with

prior responses is required to file an appeal to the Warden/Administrator of the formal grievance response. Any appeal must be filed within five calendar days of the date of the response to the inmate's formal grievance. (SUF at ¶ 10.)

CCC Grievance Policy 14-5.4(Q) provides:

> If a grievance is submitted for review and the inmate/resident is transferred or released from custody, efforts to resolve the grievance will normally continue. It is the inmate/resident's responsibility to notify the Grievance Officer of the pending transfer or release and to provide a forwarding address and any other pertinent information.

(SUF at ¶ 12; Policy, Doc. 45-1 at 10.)

Mr. Alvarado did not submit any informal or formal grievance or otherwise attempt to initiate the mandatory grievance procedure. (SUF at ¶ 13.)

## III. DISCUSSION

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001). This means a prisoner must "complete the administrative review process in accordance with the applicable

procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Exhaustion is mandatory. *Booth,* 532 U.S. at 741; *Jones v. Bock*, 549 U.S. 199, 211 (2007). Under the PLRA, prison regulations define the exhaustion requirements. *Jones*, 549 U.S. at 218.

The defendant bears the ultimate burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). Once the defendant has carried that burden, the prisoner must produce evidence demonstrating that "the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and quotation marks omitted).

"The ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " *Ross v. Blake*, 136 S.Ct. 1850, 1858 (June 6, 2016) (citing *Booth*, 532 U.S., at

9

737–738.) Therefore, inmates must exhaust those "grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S., at 738, 121 S.Ct. 1819.)

There are three general situations that can render a prison or jail grievance process unavailable to an inmate. First, an administrative procedure is not available, and therefore need not be exhausted, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S.Ct. at 1859.

Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* "When rules are so confusing that no reasonable prisoner can use them, then they're no longer available." *Id.* (internal quotation marks and alteration omitted). However, the procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. *Id.* Therefore, when an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. *Id.*

Finally, administrative remedies will be deemed unavailable if "prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" or if administrators otherwise interfere with an inmate's pursuit of relief. *Id.* at 1860. For example, if the prison improperly processed an inmate's grievance, if prison officials misinformed an inmate regarding grievance procedures, or if the inmate "did not have access to the necessary grievance forms within the prison's time limits for filing the grievance," the remedies will be considered unavailable. *Albino*, 747 F.3d at 1172-73; *see also McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015) (holding that an inmate's fear of retaliation may suffice to render the grievance process unavailable, if the prisoner (1) "provide[s] a basis for the court to find that he actually believed prison officials would retaliate against him if he filed a grievance," and (2) "demonstrate[s] that his belief was objectively reasonable").

If a prisoner has failed to exhaust available administrative remedies, the appropriate remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled in part on other grounds by Albino*, 747 F. 3d 1162.

CCC's grievance policy requires the submission of an informal grievance within seven days of the incident at issue. Defendants argue that Mr. Alvarado was injured on November 3, 2013 and was therefore required to initiate his grievance

on or before November 11, 2013. But Mr. Alvarado's claims do not arise from his injury on November 3, 2013. He was given ice and pain medications on November 3, 2013. Rather his complaints arise from the alleged lack of treatment he received thereafter most notably the doctor's refusal to provide any form of pain medication on November 6, 2013. Prior to November 6, 2013, Mr. Alvarado was told a doctor would need to prescribe pain medications. On November 6, 2013, Dr. Weaver allegedly refused to give Mr. Alvarado pain medications.

Mr. Alvarado was transferred out of the facility on November 11, 2013, six days later. He was not required under CCC's policy to file a grievance regarding the November 6, 2013 alleged denial of medical care until November 13, 2013

Defendants also argue that the policy requires Mr. Alvarado to file a grievance even after he was transferred from CCC. But the policy is vague in that it states that efforts to resolve the grievance will "normally continue." Mr. Alvarado, however, testified that after leaving CCC he was housed in Pharaump, Nevada where he requested grievance forms and was told they did not have those forms because he was at a different facility. (Alvarado Decl., Doc. 63-1 at 2, ¶ 8.) He was then transferred to Herlong, California and was told again that he was at a different facility. (*Id*. at ¶ 9.)

Although the policy requires that an inmate notify the grievance officer of a

pending transfer and provide a forwarding address, there is no evidence to suggest that Mr. Alvarado knew when or where he would be transferred. As set forth above, it is the Defendants' obligation to produce evidence showing that a remedy is available "as a practical matter," that is, it must be "capable of use; at hand." *Albino*, 747 F.3d at 1171.

The Court finds that Mr. Alvarado was transferred from CCC prior to being required to file a grievance and was thereafter unable to receive the proper forms to exhaust his administrative remedies. Thus, administrative remedies were not available and Defendants' Motion for Summary Judgment should be denied.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

Defendant's Motion for Summary Judgment (Doc. 41) should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[1] 28 U.S.C. § 636. Failure to timely file written objections may bar a de novo determination by the district

---

[1] As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d). Therefore, three (3) days are added after the period would otherwise expire.

judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 21st day of June 2017.

/s/ John Johnston
John Johnston
United States Magistrate